IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

*FILED 03 APR 10 PM 2:57 U.S. DISTRICT COURT N.D. OF ALABAMA*

JACK DANIELS,                          )
                                       )
        Plaintiff,                     )
                                       )          CIVIL ACTION NO.
v.                                     )
                                       )          02-AR-1081-S
SECURITY ENGINEERS, INC.,              )
                                       )
        Defendant.                     )
                                       )

*ENTERED APR 10 2003*

### MEMORANDUM OPINION

Before the court is a motion for summary judgment by
defendant, Security Engineers, Inc. ("SEI"). Plaintiff, Jack
Daniels ("Daniels"), a black former employer of SEI who was
terminated, brings this action under Title VII asserting claims
of hostile race environment and retaliation. Daniels has given up
his claim of hostile work environment, leaving as his only
complaint a claim of retaliatory discharge.

### Statement of Undisputed Facts

Daniels was hired as a security officer by SEI on or about
August 27, 1998 as part of the City Action Partnership ("CAP").
On June 13, 2001, Daniels sent a letter addressed to "CAPS", but
not addressed to anyone in particular, alleging that "supervisors
and employees subject[ed] one another to profanity and cursing"
and that a group of employees, including one white person, was
ordered out of the office by a supervisor and referred to as

1



"idiots." Daniels admits that in his said letter he did not
complain of racial discrimination or assert that black employees
were treated differently from white employees. Daniels admits
that both whites and blacks used profanity and that both were the
targets or hearers of profanity. In other words, for aught
appearing in Daniels' letter, SEI was an equal opportunity
profanity dispenser.

On July 19, 2001, about a month after his first letter,
Daniels sent another letter, this time to Raymond Barrett
("Barrett"), one of Daniel's supervisors, alleging that "too much
profanity [was] used" in a meeting conducted by Barrett. Daniels'
letter stated that "this language was not directed towards me
personally." The letter went further, stating that Daniels was a
"Christian" and as such was "uncomfortable" with the words
"motherfucker, shit, [and] goddamn." Daniels admits that his
letter did not contain complaints about racial discrimination or
suggest that black employees were receiving disparate treatment.
Although Daniels' first two letters did not mention racial slurs
or harassment, Daniels now says that it was his belief that the
oppressive conduct by his supervisors and co-workers was racially
motivated. The process of reasoning by which he reached this
conclusion is conspicuously absent.

On November 6, 2001, Daniels sent a second letter to
Barrett, alleging that Ray Yokel ("Yokel"), a shift supervisor,

2

was using "foul language", such as "I thought you mother fuckers had learnt better" and "you are too fucking sensitive," when speaking to a group consisting of both black and white employees. Daniels' letter, for the first time, alleged that Yokel made a racial comment. It concerned Rondale Threatt ("Threatt"), a black CAP security officer. Daniels alleged that Yokel said "my dog just don't like his black ass, he just don't like him." How a dog figured into the situation goes unexplained.

On November 8, 2001, two days after Daniels' third letter, which first reported Yokel's alleged racial comment, Mim Goyne ("Goyne"), SEI's Director of Human Resources, and Don Bottom ("Bottom"), SEI's President, scheduled a meeting with Daniels to discuss his concerns. Following that meeting, Goyne investigated Daniels' allegations regarding the Yokel comment. Yokel denied making the comment. Nevertheless, Goyne gave Yokel a verbal warning. Goyne also investigated Daniels' general complaints about profanity. She instructed Barrett not to use profanity. Daniels acknowledges that after the November 8 meeting he never heard any SEI employee make a racial comment or use a racial slur.

On January 3, 2002 Daniels received an official reprimand for insubordination and improper conduct while on duty. This reprimand arose out of an incident in which Daniels was called by his supervisor to go to the Birmingham Greyhound Bus Station

3

because three males were there with knives. Daniels admits he was aware SEI's radio policy was to arrive at the scene, call in the situation once to the supervisor on duty, be clear and concise on the radio and then wait for instructions from a supervisor. Daniels admits he did not follow this policy but rather radioed back two additional times during this incident without instructions from a supervisor to do so. However, he argues that he was never told not to get back on the radio after he first radioed in for a supervisor and the police. After Daniels received his official reprimand on January 3, 2002 he then came into the CAP office and handed-out copies of his Disciplinary Action Report to several other CAP security officers. SEI argues that this constituted a violation of an SEI policy regarding "Discussing Employment Concerns with A Client". This policy provides that under no circumstances can an employee discuss employment concerns with a client or client's employees. Although CAP was not a client, SEI contends that CAP employees would understand this policy to mean that employees are expected to discuss such concerns with the Manager of Human Resources only and not coworkers or clients. Daniels was never told that he could not show his disciplinary notice to a co-worker.

On January 4, 2002 Daniels came into the CAP office and said "it looked like a runaway slave had broken into [his] locker." He stated that the chain of command at CAP was like a master-slave

4

relationship. In front of other CAP security officers Daniels referred to himself as a "slave" and his supervisors as "masters". In other words, Daniels himself spoke openly in racist terms generally recognized as offensive. On January 7, 2002, Daniels wrote Goyne a letter stating his belief that he was being disciplined in retaliation for his previous complaints.

Goyne's investigation led to the conclusion that after radioing back about getting a supervisor on the scene, Daniels had radioed back two more times while Barrett was trying to use the radio to get a description so as to contact the Birmingham Police Department. Goyne determined that Daniels did so despite Barrett's verbal instructions during the tense situation to keep the radio lines open in accordance with SEI's policy. Daniels maintains that he was never told to stay off the radio. Goyne also confirmed that Daniels had passed out his disciplinary report and himself used racial language.

On January 7, 2002 Daniels sent a letter to Goyne stating "during [the December 13, 2001] meeting [he] was asked what could be done to make [him] happy [and his] response was that [he] would like to receive a verbal apology from Mr. Ray Yokel and Mr. Ray Barrett for belittling and embarrassing [him]." Nowhere in the letter did Daniels allege that Yokel or Barrett had treated him unfairly because he was black.

On January 8, 2002 Daniels was terminated for

5

insubordination and for violating SEI's rules and regulations as
a result of the January 3, 2002 incident at the Birmingham
Greyhound Bus Station. Goyne testified by deposition that before
the meeting on January 8, 2003 she had already decided to
terminate Daniels. Goyne later contradicted her testimony in this
regard and instead testified that Daniels belligerent and
aggravated behavior at the meeting on January 8, 2003 was an
additional reason for terminating Daniels.

### Analysis

To establish a *prima facie* case of retaliation under Title
VII, Daniels must provide substantial evidence: (1) that he
participated in an activity protected by Title VII; (2) that
subsequent to that activity, he suffered an adverse employment
action; and (3) that there was a causal connection or link
between his participation in the protected activity and the
adverse employment action. *Pipkins v. City of Temple Terrace,
Florida*, 267 F.3d 1197, 1201 (11th Cir. 2001). Only if Daniels
makes out a *prima facie* case of retaliation does the burden shift
to SEI to rebut the presumption of retaliation by producing a
legitimate, non-discriminatory reason for the adverse employment
action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802
(1973). Once a *prima facie* case appears and SEI proffers a
legitimate, nondiscriminatory reason for the adverse employment
action, the burden then shifts back to Daniels to produce

6

substantial evidence that SEI's proffered reasons are pretextual.
*Id.*

SEI contends that Daniels has not established, and cannot
establish, a *prima facie* case of retaliation through
circumstantial evidence because he has not presented evidence to
show (1) that he participated in any statutorily protected
activity under Title VII, and (2) that there is any causal
connection between his participation in protected activity and
the termination. The court does not need to address SEI's second
argument because it agrees with SEI that Daniels has not
established the first element of his *prima facie* case.

Daniels simply did not participate in any statutorily
protected activity. In defining what constitutes "protected
activity", under Title VII, the United States Supreme Court has
made clear that an employee's reporting of one incident of
alleged harassment does not constitute a "protected activity" for
the purposes of setting up a retaliation claim. *Clark County Sch.
Dist. v. Breeden*, 121 S.Ct. 1508 (2001). The court agrees with
SEI when it argues:

> [D]espite knowing the proper procedures for reporting
> alleged harassment, Mr. Daniels admits the only alleged
> racial comment he ever reported was Mr. Yokel's comment
> about his dog not liking Mr. Threatt. No reasonable
> person could believe this single incident violated
> Title VII. Mr. Daniels did not engage in a protected
> activity.

Daniels argues that although his first two letters did not

7

mention racial slurs or harassment, it was Daniels **belief** that the conduct of his supervisors and co-workers was based on race. A plaintiff cannot establish a *prima facie* case of retaliation unless he first shows that he had a good faith, reasonable belief that what he complained about was an unlawful employment practice. *See Rollins v. State of Fla. Dept. of Law Enforcement,* 868 F.2d 397, 400 (11th Cir. 1989). A plaintiff must not only show that he subjectively believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented. *Little v. United Technologies,* 103 F.3d 956, 960 (11th Cir. 1997). "It is thus not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and the record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." The belief must also be measured against substantive law at the time of the offense. *Lipphardt v. Durango Steakhouse of Brandon, Inc.,* 267 F.3d 1183 (11th Cir. 2001).

The Supreme Court has made it clear that to prove a claim of hostile work environment the conduct complained of must be so extreme as to amount to a change in the terms and conditions of employment and that this standard is necessary to ensure that Title VII does not become a general civility code. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). *See also Evans*

v. *PEMCO,* 1998 WL 1048470, *3,*14 (N.D. Ala. 1998)(holding that four instances of alleged racial conduct did not demonstrate an objectively hostile work environment). By having abandoned his hostile work environment claim, Daniels concedes that there is no factual basis for it. Assuming *arguendo* that Daniels in fact believed that profanity equals a racially hostile work environment such is not objectively reasonable in today's world that is no longer the Garden of Eden.

Despite sending three letters complaining about profanity, Daniels never told SEI orally or in writing that he felt the use of foul language was racially motivated. In his third letter he mentioned one alleged racial comment. In light of the actual facts, Daniels' argument that he reasonably believed that Yokel's comment "my dog just don't like his black ass, he just don't like him," and the use of profanity constituted a violation of Title VII is so implausible that it cannot be submitted to a jury. *See Little v. United Techs.,* 103 F.3d 956, 960 (11th Cir. 1997)(holding that an employee does not engage in reasonable opposition by challenging an isolated racial insult). Without protected activity to complain about the court does not reach the questions that would have to be answered if Daniels' complaints had been of a protected variety.

## Conclusion

By separate order, this court will grant SEI's motion for

9

summary judgment.

DONE this _10_ day of April, 2003.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE